UNITED STATES DISTRICT COURT
SOUTHER DISTRICT OF FLORIDA

1:15-CV-23343-MORENO/TURNOFF

RICHARD MASSA,

    Plaintiff,

v.

THE SCHOOL BOARD
OF MIAMI-DADE COUNTY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

**THIS CAUSE** is before the Court upon Defendant The School Board of Miami-Dade County ("School Board's") Motion for Final Summary Judgment **(ECF No. 62)**, and an Order of Referral entered by the Honorable Federico A. Moreno. **(ECF No. 65)**. The Motion was filed on May 5, 2017 **(ECF No. 62)**, and was referred to the undersigned on May 10, 2017. **(ECF No. 65)**. A hearing took place before the undersigned on July 26, 2017. **(ECF No. 85)**. Upon review of the Motion **(ECF No. 62)**, the Response **(ECF No. 70)**, the Reply **(ECF No. 75)**, the court file, hearing argument from counsel, and being otherwise duly advised in the premises, the undersigned makes the following findings.

### Background

This action was originally filed by Plaintiff, Richard Massa ("Massa") on August 7, 2015 in the Eleventh Judicial Circuit in Miami-Dade County, Florida. Subsequently, the case was removed to this district on September 3, 2015. **(ECF No. 1)**. A First Amended Complaint was filed on September 29, 2015. **(ECF No. 13)**. Following a hearing before Judge Moreno **(ECF No. 25)**, the First Amended Complaint was dismissed without prejudice on February 29,

2016. **(ECF No. 26)**. On March 15, 2016, Massa filed his Second Amended Complaint ("SAC"). **(ECF No. 27)**. The SAC alleges, among other things, unlawfully retaliation in violation of the First Amendment to the Constitution, under U.S.C. § 1983. Id. Thereafter, on January 25, 2017, Massa filed a Motion for Leave to File a Third Amended Complaint. **(ECF No. 39)**. That Motion was denied. **(ECF No. 41)**. Accordingly, the SAC remains the operative pleading.

## SAC

By way of summary, the SAC – and Massa's affidavit – allege as follows. Massa claims that School Board unlawfully retaliated against him for exercising his free speech and free association rights. **(ECF No. 27)**. Specifically, he alleges that the School Board started retaliating against him after he lent his support to fellow teacher, Luz Morales, during her disciplinary proceedings, in early March 2013. Id.; Massa Aff. at ¶ 5 **(ECF No. 72-1)**. According to Massa, Morales approached him and stated that she had been threatened by the administration, namely, Principal Tracy Roos ("Roos"), the Principal at Neva King Cooper School, to inflate student test scores. Id. In the following months, he met with, and wrote to, several administrators addressing these issues – including a December 20, 2013 letter to the Commissioner of the Florida Department of Education ("FDOE"). Id. Thereafter, on January 27-31, 2014 and on February 14, 2014, Massa testified on behalf of former Principal Dr. Alberto Fernandez and former Assistant Principal Henry Cristobal at a hearing before the Florida Division of Administrative Hearings ("DOAH"). Fernandez and Cristobal were alleging, among

other things, retaliation by School Board, because of their involvement in a charter school conversion plan.[1] Id.

On February 22, 2014, Massa, and another colleague, Tebelio Diaz, filed a written complaint with the FDOE, Office of the Inspector General ("OIG"), alerting the Inspector General about the pressures that were being placed on teachers to inflate test scores. Massa Aff. ¶ 14. Massa forwarded a copy to M-DCPS Superintendent Carvalho. Id. Later that month, Massa met with OIG Special Agent Ellen Roelofs, to help with the investigation of his complaint. Id. He was told that OIG and the Civilian Investigation Unit (CIU) would conduct an investigation. Id. at ¶15.

He alleges that shortly thereafter, the School Board "began a series of false and defamatory accusations and unwarranted investigations" against him in retaliation for "exercising his First Amendment rights." Id. In this connection, he claims that on March 9, 2014, Roos,[2] "angrily accosted [him] regarding his complaint reporting that teachers were being pressured to inflate test scores." Id. A few days later, on March 13, 2014, Massa continued cooperating and was interviewed by the CIU as to his complaint. Id. A few weeks later, on May 27, 2014, Roos gave Massa what he calls "a downgraded" performance evaluation. Id. That is, instead of being rated as "highly effective," he was given a rating of "effective." Id. He claims that when he inquired as to why his rating was downgraded, Roos told him something along the lines of "You know why you [didn't] get any 'highly effective' ratings; you know what's been

---

[1] The DOAH ultimately determined that the School Board had, in fact, violated Fla. Stat. § 1002.33 (4), which among other things, prohibits reprisals against employees that are "either directly or indirectly involved with an application to establish a charter school." As part of DOAH's ruling, Fernandez was awarded $10,590 in attorney's fees and costs. **(ECF No. 72-10)**.

[2] Roos denies that this alleged accosting took place. Hr'g Tran. 14:19-25;15:1-4. **(ECF No. 86)**. She also denies having had any knowledge of Massa's testimony as a witness at the DOAH proceedings until the date of her deposition – February 28, 2017. Roos Dep. 47:1-25; 63:1-25. **(ECF No. 64-1)**. She likewise claims to have had no prior knowledge of Massa's written complaint to the OIG. Id. at 59:1-9.

3

going on." Id.;[3] Massa Aff. ¶ 20; **(ECF No. 72-1, p.4)**.  According to Massa, the retaliation continued.  In August of 2014, Roos reassigned Massa's experienced paraprofessional (classroom aide) of five years, and replaced that aide with an inexperienced one. Id. At the same time, Massa was assigned a new group of students with "severe behavioral disorders and violent tendencies." Id.

As stated above, Massa testified on behalf of Luz Morales at a DOAH hearing contesting Morales discharge.[4] Id. The hearing took place on January 14, 2015.  Because of this, Massa claims that on March 13, 2015, the School Board accused him of test cheating and subjected him to an investigation. Id.  Specifically, he was accused by Roos, in a complaint to the CIU, of providing answers – by way of test booklet that contained stray marks– to a student during testing.[5] **(ECF No. 27)**.  The CIU concluded that Massa violated the testing procedures by using a testing booklet that contained markings, and as a result, he was reprimanded. Id.  Next, around April 2015, the School Board reported to the Florida Department of Children and Families ("DCF") that Massa was negligent in supervising a child who choked on food. Id. Thereafter, on April 22, 2015, the School Board began investigating Massa for three separate choking incidents. Id.

A few weeks later, around May 4, 2015, the School Board accused Massa of sexual misconduct with one of his male students in the bathroom. Id.  Specifically, during the CIU investigation, someone reported that Massa was taking the student to the restroom with him

---

[3] Roos denies ever having made that statement. Roos Dep. 73:1-25.
[4] Following her involvement in the complaint noted *supra*, Morales was accused of negligence and was dismissed in relation to a student while on a field trip. She was later exonerated following a DOAH hearing. Morales Aff. at ¶ 16. **(ECF No. 72-13)**;
[5] Massa suggests that this conduct is retaliatory because, *inter alia*, he was the one who actually came forward and reported that the test booklet contained stray marks, and sought guidance from Roos' Assistant Principal, Alicia Fernandez. Massa Aff. at ¶ 23.

4

whenever he, i.e., Massa, used the facilities. Id. However, Massa claims Roos had been aware of the situation for some time. Id. Specifically, Massa claims that he personally informed[6] Roos in October 2014 that this practice was necessary because his assigned assistant or paraprofessional was afraid of the student, who was very violent. Massa Aff. ¶ 40. According to Massa, Roos voiced no objection. **(ECF No. 27)**. Nevertheless, on June 10, 2015, the School Board sent M-DCPS Police Detective L. Samuel to Massa's house to investigate. Id. Subsequently, Massa became the subject of rumors in his neighborhood. Id. Ultimately, it was determined that there was no misconduct.

Finally, Massa claims that School Board retaliated against him by denying his usual summer employment – which represents approximately $8,000 in earnings. Id.; Hr'g Tran. 10:6-7. **(ECF No. 86)**. The School Board, however, claims that it rightfully denied summer employment, as per its policy, during the pending investigation as to the conduct in the bathroom. Id.; see also, MDCPS 2015 Summer Implementation Document. **(ECF No. 64-1)**.

### Related Case Before Judge Gayles

Following their DOAH proceedings, cited *supra*, Fernandez, Cristobal and Ramirez filed suit in this district and litigated their case before Judge Gayles. Fernandez, et al v. School Board of Miami-Dade County, Case No. 15-cv-21915-DPG (hereinafter "Fernandez"). There, as here, the plaintiffs alleged violations of free speech and retaliation. Id. Judge Gayles recently entered summary judgment against Fernandez and Cristobal. Fernandez at **(ECF No. 64 )**. However, Ramirez' case was allowed to proceed, because the Court found that certain factual accounts regarding the charter school conversation were in dispute. Id.

---

[6] In his Affidavit, Massa states that he would instruct the student to stand directly behind him and face the wall – shielding the student from the view of the urinal. Id. at ¶ 40.

5

## School Board's Motion for Summary Judgment

In its Motion, the School Board raises the following arguments: Massa is unable to prove a "custom and usage" of retaliation of protected free speech because, (a) the alleged retaliatory acts were not committed by a final policy maker; and (b) Massa's only evidence of custom is a series of six isolated instances over a ten year period. **(ECF No. 62)**. Along these same lines, the School Board argues that even if Massa could prove custom, he could not prove that he suffered from any materially adverse employment actions that would warrant relief. Id. Further, even if Massa could show adverse employment actions, the School Board contends that it has given legitimate business reasons for all actions taken. In its view, Massa is unable to rebut these and show pretext under the McDonnell Douglas framework. Id. The legitimate reasons, as offered by the School Board, are reflected in its supporting documents, declarations, and deposition testimony. A few of the highlights are listed below.

By way of summary, the School Board contends that Massa breached the testing procedures by using "soiled" booklets – containing markings, e.g. X's and O's– and failed to immediately, and properly, report same. Def.'s Stat. Undisputed Facts. **(ECF No. 63, ¶ ¶ 10-11)**. Massa had been trained by the assistant principal on the requisite procedures to follow when test materials are "soiled" and/or contain markings. Id. Therefore, in its view, the incident was properly reported as a breach of procedure. Id. With regards to the three choking incidents, the School Board argues that Roos was concerned because of their number and frequency (one in February and two in April 2015). Id. at ¶ ¶ 12-13. In light of same, she reported the incidents to the MDCPS Office of Professional Standards, who instructed her to perform an administrative review. Id. Pursuant to the Florida Statutes, and the School Board's procedures, it was

necessary to alert DCF as well. Id.   Again, in the end, no wrongdoing was found, and no discipline resulted. Id.

During the investigation, however, the School Board claims that an aide came forward and raised concerns about the bathroom incidents noted above. Id.  In light of this, DCF instructed the School Board to look into the matter further. Id.  In other words, the School Board contends that it commenced the investigation at the suggestion of DCF.  Id.  Thereafter, the subject investigation took place in the summer of 2015.  Id.  Pursuant to its internal policies, the School Board prohibits offering summer employment to employees who are under investigation. Id. at ¶ 15; see also, MDCPS 2015 Summer Implementation Document. **(ECF No. 64-1)**.   It is because of this policy, they claim, that Massa was denied summer employment during the pendency of the investigation. Id.  The following summer, however, after Massa had been cleared, he was again offered summer work. Id.

Massa, of course, disagrees with the School Board' interpretation of the events and the proffered reasons for its actions.

## **Legal Standard**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden to inform the court of the basis for its motion and identify the portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Thereafter, to overcome summary judgment, the nonmovant must "go beyond the pleadings" and set forth "specific" material facts that remain in dispute. "[T]here is no issue for trial unless there is sufficient

evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In so doing, the Court should view all evidence and make all justifiable inferences in favor of the non-moving party. Id.

## Analysis

*Custom and Usage Retaliation*

Municipality liability under § 1983 has been limited by the Supreme Court. Grech v. Clayton Cty, Ga., 335 F.3d 1326, 1329 (11th Cir. 2003). In this connection, a school board's liability may not be hinged on the doctrine of *respondeat superior*. Id.; (citing City of Canton v. Harris, 489 U.S. 378, 385 (1989)). Instead, a school board may only be held liable "for acts for which [the School Board] is actually responsible." Marsh v. Butler Cty., 268 F.3d 1014, 1027 (11th Cir. 2001). Here, there are two ways in which Massa can establish the School Board's liability under § 1983: "identify either (1) an officially promulgated [School Board] policy or [2] an unofficial custom or practice of the [School Board] shown through the repeated acts of a final policy maker for the [School Board]." Grech, 335 F.3d at 1329.

In other words, Massa must show that the School Board has a custom or usage of permitting the constitutional violation. He must also show the existence of "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law.'" Fernandez v. School Bd. of Miami-Dade Cty., Fla., 2017 WL 2537281, *5 (S.D. Fla. June 12, 2017) (citing Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1481 (11th Cir. 1991)). In this regard, "a

8

municipality's failure to correct the constitutionally offensive actions of its employees can rise to the level of a custom or policy 'if the municipality tacitly authorizes these actions or displays deliberate indifference' towards the misconduct." Whitaker v. Miami-Dade Cty., 126 F. Supp. 3d 1313, 1320 (S.D. Fla. Feb. 20, 2015) (quoting Griffin v. City of Opa-Locka, 261 F.3d 1295, 1308 (11th Cir. 2001).

When express policy or custom is absent, a school board may still be liable "for a single act or decision of a municipal official with final policymaking authority in the area of the act or decision." Cuesta v. School Bd. of Miami-Dade Cty., Fla., 285 F.3d 962, 968 (11th Cir. 2002); see McMillian v. Johnson, 88 F.3d 1573, 1577 (11th Cir. 1996). Further, under a ratification theory, the School Board may likewise be held responsible "[for] actively endorsing or approving the conduct of its employees or officials." Fernandez, 2017 WL 2537281, * at 6; (quoting Garvie v. City of Fort Walton Beach, 366 F.3d 1186, 1189 (11th Cir. 2004)). Under this theory, however, Massa must show that the School Board "had an opportunity to review the subordinate's decision and agreed with both the decision and decision's basis." Id.

Here Massa intends to prove custom with approximately six alleged instances of retaliation and nine witnesses. The first three are Fernandez, Cristobal and Ramirez – the Plaintiffs in the Judge Gayles case cited *supra*. Again, Fernandez, Ramirez, and Cristobal obtained a favorable result at the administrative level, i.e., a finding that the School Board had violated the "anti-reprisal" provision in Fla.Stat. § 1002.33(4). **(ECF No. 63)**. As to them, Massa claims that the School Board knew, or should have known, about the issues because, at a minimum, the administrative order from DOAH was specifically addressed and forwarded to the School Board. **(ECF No. 72-10)**. As noted above, the School Board ultimately prevailed on summary judgment, in this Court, as to Fernandez and Cristobal. However, Ramirez' claim

9

was allowed to proceed. *Fernandez, et al v. School Board of Miami-Dade County*, Case No. 15-cv-21915-DPG.

Plaintiff also intends to use affidavits and/or testimony from Luz Morales, Shawn Beightol, Trevor Colestock, Justin Koren, Patrick Williams, and Tebelio Diaz. For example, Luz Morales, a veteran teacher at Neva King Cooper, filed an Affidavit stating that she, like Massa, supported Fernandez, Cristobal and Ramirez with respect to the charter school conversations. Morales Aff. ¶ 5. **(ECF No. 72-13)**. She further states that, because of this, among other things, she was retaliated against. To this end, Morales claims that she was threatened by Roos with a poor evaluation unless her students achieved higher test scores on the Florida Alternative Assessment. Morales Aff. ¶¶ 7-8. Along these same lines, she states that Roos directed her to give "the best interpretation" to hand gestures or gestured-responses by students during testing.[7] Id. She found these directives to be troublesome. Thus, with Massa's assistance, she wrote a letter to the District's Regional Director. Id. at ¶¶ 8-9 Thereafter, she claims that she was wrongfully accused of negligence with respect to a wheelchair-bound student. Id. at ¶¶ 10-13. The School Superintendent, Alberto Carvahlo, recommended her dismissal. Id. Subsequently, following administrative proceedings before DOAH, she was exonerated and was able to get a reversal of her discharge. Id. ¶ at 16. In short, she got her job back. In her affidavit, she states that "[she] believes that [her] termination was [sic] resulted from supporting the charter [school] conversion and reporting [the] grade inflation." Id. at ¶ 17.

Trevor Colestock, a special education teacher, has also filed an Affidavit in support of Massa. To this end, he states that he was retaliated against for reporting teacher assisted

---

[7] The students at issue are disabled, some severely. Oftentimes, they are permitted to provide examination answers by way of hand gestures.

cheating. Colestock Aff. **(ECF No. 72-15)**. Following his complaint to the Miami Dade Office of the Inspector General (OIG), the OIG issued a report concluding that teachers had supervised and assisted students to cheat on tests. Coltstock Aff. at ¶¶ 6-7. Id. As a result, ceratin teachers were dismissed and/or transferred. Id. at ¶ 9. Thereafter, Colestock drafted and published several articles on this issue. Id. at ¶¶ 10-13. One of the articles was entitled, "Who Says Cheating Doesn't Pay?" in which he describes how Miami Norland High jumped from a "C" school to an "A" school, and, in light of same, received over $230,000 in bonuses. Id. Colestock avers that because of this, he was subjected to, among other things, threats, downgraded evaluations, and the loss of his night school class. Id. at ¶¶ 59-61. In his affidavit, he also states that Chief Human Capital Officer Enid Weisman was aware of these matters, and suggested that he transfer from his school. Id. at ¶¶ 48-51. He further avers that on October 24, 2013, he was involuntarily transferred and escorted out of Norland High by Dr. Linda Amica-Roberts and school police. Id. Colestock's claims are currently being ligated in state court. Trevor Colestock v. The School Board of Miami-Dade County, Case No.: 14-007877 CA 01.

Again, these are just random examples taken from the many that are of record. The undersigned makes no findings as to the veracity of the allegations made by Massa's supporters, or the ultimate merits of Massa's case itself. However, upon review, the undersigned finds Massa has come forth with sufficient evidence, i.e, letters, administrative orders, deposition testimony and affidavits to suggest that the School Board had some notice as to at least some of these issues and/or matters. See e.g., Massa Aff., Dr. Fernandez Aff., Cristobal Aff., Detzner Aff., Morales Aff., Colesotck Aff., Williams Affid., Beightol Aff., Koren Deposition, DOAH Order; **(ECF No. 72, Ex. 1-24)**. Because of this, it appears that Massa has sufficiently plead to survive summary judgment.

11

*Materially Adverse Employment Actions*

"To make a prima facie showing of retaliation, the plaintiff must show: (1) that she engaged in statutorily protected conduct; (2) that she suffered adverse employment action; and (3) that there is 'some causal relation' between the two events." Alvarez v. Royal Atlantic Developers, Inc., 610 F.3d 1253, 1268 (11th Cir. 2010); see McCann v. Tillman, 526 F.3d 1370, 1375 (11th Cir. 2008). The Supreme Court considered Title VII's anti-retaliation in Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006). There, the Court found that the anti-retaliation provisions protect a person "from retaliation that produces an injury or harm." Id. at 67. In reaching that conclusion, it stated as follows.

> The test for whether the retaliation is actionable is whether 'a reasonable employee would have found the challenged action materially adverse' . . . 'Whether a particular [action] is materially adverse depends on the circumstances of the particular case, and "should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.

Id. at 67-71; (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75 (1998)).

In other words, an employee's subjective view of the adversity of his/her employer's actions is not necessarily controlling. Davis v. Town of Lake Park, 245 F.3d 1232,1239 (11th Cir. 2001).

Here, for example, the School Board suggests that Massa has suffered no adverse action. Specifically, the School Board states that after Massa expressed concern about his evaluation, Roos met with him and changed as many as two categories on his evaluation to "highly effective." Roos Dep. 73:186-188. **(ECF No. 64-1)**. Further, according to the School Board, the evaluations in no way materially impacted his compensation or any other terms and conditions of employment. Massa Depo. 2, P. 28–29. **(ECF No. 62-6)**.   In this connection, they note that Massa conceded that he requested the changes to his evaluation only "for righteous

reasons." Id.   The School Board also suggests that the written reprimand was inconsequential and affected neither his pay, nor his terms of employment. **(ECF No. 63)**.

Upon review, however, and taking matters in the light most favorable to Massa, some of the circumstances at issue may constitute colorable adverse action. In particular, and at a minimum, the domino effect created by these events, and their subsequent domino effect on Massa and his reputation. Simply put, there are too many unresolved issues of fact to simply enter summary judgment and call it a day.

*McDonnell Douglas Burden-Shifting Analysis*

In this Circuit, the evidentiary burden is the same for both a § 1983 case and a Title VII case. Butler v. Alabama Dept. of Transp., 536 F.3d 1209 (11th Cir. 2008). The Supreme Court "has made clear that a plaintiff can prove disparate treatment either (1) by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, or (2) by using the burden-shifting framework set forth in McDonnell Douglas." Young, 135 S. Ct. at 1345; see Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 121 (1985). Direct evidence is "evidence, which if believed, proves [the] existence of fact in issue without inference or presumption." Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 n. 6 (11th Cir. 1987) (quoting Black's Law Dictionary 413 (5th ed.1979)).

Thus, if the actions taken against Massa were enough to establish that element of a *prima facie* retaliation case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employees rejection." McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). "If the employer articulates such a reason, the plaintiff then has "an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant . . . were not its true reasons, but were pretext for discrimination," Young v. United

Parcel Service, Inc., 135 S. Ct. 1338, 1345 (2015) (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981). However, School Board "need not persuade the court that it was actually motivated by the proffered [legitimate] reasons. . . . It is sufficient if [School Board's] evidence raises a genuine issue of fact as to whether it discriminated against [Massa]. To accomplish this, [the School Board] must clearly set forth, through the introduction of admissible evidence, the reason's [for] [Massa]'s rejection." Texas, 450 U.S. at 254-255.

Here, the School Board has ably set forth its reasons for each and every action taken. They are well documented in the papers, and were placed on the record at the hearing. (**ECF No. 62, 64, 86**). Thus, there is no need to re-recite all of them here. Suffice it to say that the proffered reasons may well be legitimate, and certainly appear to be. For example, Assistant Principal Feranndez reported Massa's breach in testing procedures, as required. Fernandez Dep. 45-51; 65-66; Massa Dep. No. 2, p. 70-11. Upon review, Massa was found to have violated the procedures. (**ECF No. 63**). Thus, the written reprimand was appropriate. In addition, as noted above, the School Board claims that it followed its procedure on "Abuse and Neglect," as well as the Florida Statutes,[8] when it reported the three separate choking incidents. Roos Dep. P. 138: Additional reasons proffered by the School Board have been discussed in detail throughout this report.

Nevertheless, this Court is not satisfied that the entry of summary judgment is appropriate here, on this record. Simply put, while Massa's claims face difficult challenges, he has plead sufficiently to survive summary judgment. At a minimum, among other issues, there remains a dispute as to certain interactions between Massa and Dr. Roos, which she denies ever occurred.

---

[8]See, Fla. Stat. § 39.201, Fla. Stat. § 1006.061; see also, School Board Policy 8462 – Student Abuse and Neglect; School Board Policy 1213- Student Supervision and Welfare.

14

In this connection, the issue is whether Roos told Massa, "You know why you didn't get any highly effective rating, you know what's been going on." Massa Aff. at ¶ 26. She denies having done so. Roos Dep. 73-74. Also at issue is whether Roos saw Massa in the hallway when he testified on behalf of Morales at the DOAH hearing. Massa states that they greeted one another. Massa Aff. at ¶¶ 25-27. Roos testified that she did not know that Massa was there. Roos Dep. at p. 71.

Another issue that appears to be in dispute is Massa's contention that he disclosed to Roos (in October 2014) that he was taking a difficult student into the bathroom with him, because his assistant was afraid of the student. Massa Aff. at ¶ 40. As noted above, this issue was the subject of a subsequent investigation and serious allegations of sexual misconduct against Massa. There likewise appears to be a dispute, although in this Court's view it is not as significant for present purposes, as to whether certain students – involved in the three choking incidents – were ever transported to the hospital. **(ECF No. 71)**. According to Massa, as least one, possibly two, of these students remained in the classroom post incident and did not need to be transported. Id. These matters, especially as it relates to certain factual accounts of conversations, as considered by Judge Gayles in the related *Fernandez* case, are better suited for resolution at trial.

Consistent with the above, it is **RESPECTFULLY RECOMMENDED** that the School Board's Motion for Summary Judgment **(ECF No. 62 )** be **DENIED**.

Pursuant to S.D. Fla. Magistrate Rule 4(b), the parties may serve and file written objections to this Recommendation with the Honorable Federico A. Moreno, United States District Judge for the Southern District of Florida, within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file timely objections shall bar the

parties from attacking on appeal any factual findings contained herein. <u>RTC v. Hallmark Builders, Inc.</u>, 996 F.2d 1144 (11th Cir. 1993); <u>LoConte v. Dugger</u>, 847 F.2d 745 (11th Cir. 1988).

**RESPECTFULLY RECOMMENDED** in Chambers at Miami, Florida on this 16 of August 2017.

*/s/ Wm. C. Turnoff*

**WILLIAM C. TURNOFF**
**UNITED STATES MAGISTRATE JUDGE**

cc: Hon. Federico A. Moreno
Counsel of Record